UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | DOCKET NO. 2:18-cr-122-JDL |
| ) | |
| MAURICE DIGGINS ) | |

**MOTION IN LIMINE TO EXCLUDE or LIMIT TATTOO EVIDENCE
INCLUDING TESTIMONY OR PROPOSED GOVERNMENT EXPERT
CHRISTOPHER MAGYARICS AND INCORPORATED MEMORANDUM**

**I.   Overview**

Maurice Diggins has a lot of tattoos. Most are innocuous, but several are prejudicial in the context of the current charges. The defense asks the court to exclude any reference or evidence about Diggins' tattoos in the government's opening or case in chief. Of concern to the defense are tattoos of swastikas, "SS" lightning bolts, "Dirty White Boys," "DWB," and a bottle shape[1] with fourteen words[2] inside it. The government has retained Christopher Magyarics of the Anti-Defamation League to offer proposed "expert" testimony on Diggins' tattoos and Mr. Magyarics opinions on racial beliefs related to these tattoos.

---

[1] The bottle is styled after an Absolute vodka bottle and features the word ABSOLUTE at the top and the word PRIDE at the bottom. The parties have discussed how to best provide the court with images of the tattoos at issue and will make a submission once the government has filed a response to this motion.

[2] The fourteen words are, "we must secure the existence of our people and a future for white children"

1

**II.    Charge**s

Diggins is charged with conspiring to and violating 18 U.S.C. § 249(a)(1); "willfully caus[ing] bodily injury to any person or . . . attempts to cause bodily injury to any person **because of** the actual or perceived race, color, religion, or national origin of any person." (Emphasis added). This is a specific intent crime. "Because of" requires a showing of but-for causality. *Burrage v. United States*, 134 S. Ct. 881, 889 (2014). The government must prove beyond a reasonable doubt that Diggins' conduct, conspiratorial or actual was directed at the victim(s) "because of" the victims' "actual or perceived race [or] color." *United States v. Miller*, 767 F.3d 585, 592 (2014). See Diggins Proposed Jury Instructions. There is no question that several assaults occurred. The trial will focus on if Diggins had a role in the assaults and if he had a role, was it motivated by the race of the victims.

**III.   Relevance**

Under the Federal Rules of Evidence, "irrelevant evidence is not admissible" at trial. Fed.R.Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed.R.Evid. 401. Assuming evidence is relevant, Rule 403 nonetheless grants trial courts discretion to exclude that evidence "if its probative value is substantially outweighed" by the risk of "unfair prejudice." Fed. R. Evid. 403.

The government intends to offer evidence of certain Diggins' tattoos, and have Mr. Magyarics give opinion testimony regarding the meaning of the tattoos. The tattoos are primarily on Diggins arms (there is one on an ankle). Video and photos from the April 14-15 time frame show Diggins was always in long sleeves and the tattoos were not visible. The alleged victims did not know Diggins, nor did they know of his tattoos. During the incidents Diggins did not mention the tattoos to anyone, nor were they the subject of any statement. Diggins was dressed in "normal" clothing all night; he was not in a "uniform" a costume or any attire that was symbolic of any organization or viewpoint. Diggins has a "normal" hairstyle. Diggins was not wearing any clothing with words, slogans, patches or other markings that might signal beliefs or thoughts. There is no evidence Diggins was the member of any organization that holds racially biased views. There is no evidence of racist writings or social media posts by Diggins. There is no evidence of social or political activism by Diggins. Diggins wore no jewelry indicative of belonging to a racist organization. Looking at Maurice Diggins on the night of April 14 and early morning of April 15, there is nothing visible to anyone that would suggest Diggins held any animosity toward those of color.

The evidence is expected to show that out of seven males assaulted, three were Caucasian- two hockey team members on Wharf St. and a bar patron outside Silver House, one who identifies as "Hispanic" - also a member of the hockey team; and three black men, two outside Silver House and one at the Biddeford 7-Eleven. The charges focus on the three

black victims alleging they were targeted due to race. Seeking to make that link, the government is offering Diggins' tattoos and testimony by Mr. Magyarics as "relevant" evidence from which a jury might infer the black men were assaulted due to their race. The tattoos are not relevant because there is nothing to suggest the tattoos have any connection with the assaults or racially motivated the assaults.

In *United States v. Metcalf* the defendant was in a bar drinking and playing pool. He got in an argument with some other patrons, pushing a Black male. *United States v. Metcalf*, 881 F.3d 641, 643 (8th Cir. 2018). The bar owner intervened. Metcalf bragged to the bar owner about how he had burned crosses at an African American family's home, said, "I hate f---ing n----rs," and asked if the bar owner wanted anyone taken care of. Defendant Metcalf showed the bar owner his swastika tattoo and repeated how he "hate[d] them f---ers." Id. Later that night Metcalf attacked an African American victim, kicking and stomping and repeatedly saying "die n—er." *Id.* Defendant Metcalf displayed his tattoos in conjunction with making racial slurs and in relationship to and shortly before the assaultive conduct. On April 14-15, 2018, Diggins never displayed or showed his tattoos during the incidents and never discussed or made racial remarks to third parties.

In *United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014), the defendants were shirtless when they approached the victim, clearly displaying their white supremacist tattoos,

4

including lightning bolts and the motto of the Aryan Circle among others. *Id.* at 495. The altercation was initiated by the repeated use of the word "n–er" to an African American man, and no non-racially motivated reason could have explained the attack. *Id.* at 507. Again, unlike Diggins, the Cannon defendant displayed his tattoos as part of the altercation, making them relevant to intent.

There is no evidence or allegation o that Diggins or Leo was part of a racist organization, nor did Diggins mention or show his tattoos during any of the alleged attacks. The mere existence of tattoos, with no display or mention, undermines their relevance.

## IV.   Fed. R. Evid. 403

Under Fed. R. Evid. 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence of the tattoos raises unfair prejudice, as the perceived controversial beliefs expressed through the content will influence the jury despite any admonishment or limiting instruction to consider the evidence for any reason other than to establish motive. Allowing tattoo evidence risks Diggins' being convicted due to the tattoos rather than the alleged conduct charged.

## V. Fifth Amendment Violation

The Government's evidence of Diggins' tattoos comes from photographs taken at the jail following his arrest. The Fifth Amendment protects a defendant from compelled communications. Where the government relies on evidence of a defendant's tattoos not as an identifying physical characteristic, but for the 'content of what was written, the tattoo is testimonial. *United States v. Greer*, 631 F.3d 608, 612–13 (2d Cir. 2011); *U.S. v. Ledbetter*, 188 F.Supp 3d. 674, 681 (S.D. OH 2016). While the initial tattoo was not compelled by the government, the photographs being offered were compelled. These were taken at the jail as part of the booking process and Diggins' was forced to allow the photographs to be taken. It is only through these jail photographs that the prosecution and Mr. Magyarics are aware of the tattoos. *Ledbetter* at 683. The tattoos should be excluded as compelled self-incrimination under the Fifth Amendment.

## VI. Exclusion or Limitation of Testimony by Mr. Magyarics

The Government has indicated their intention of called Mr. Magyarics as an expert witness on racially motivated or "white supremacist" tattoos. Defense counsel requested expert discovery in July 12, 2019 under rule 16(a)(1)(G). In response the government has supplied a CV of Mr. Magyarics, notes re government interview(s) of Mr. Magyarics (9/26/19 and 2/13/20) and a 9 page document received on 2-12-20 which while not titled

"report" seems to serve that purpose.[3]

Magyarics testimony is not admissible under Evidence Rule 702(a) because it will not assist the jury to understand the evidence or to determine a fact in issue. An expert is not needed for the jury to understand testimony from lay witnesses about what occurred during the incidents in the Old Port and the Biddeford 7-Eleven. Nor is testimony from Magyarics needed to explain the history of the swastika. The tattoos that contain words, if admissible, do not require Magyarics' commentary, they speak for themselves. His testimony is also inadmissible under Rule 702(b) because the government has not established that his opinions are based on reliable principles and methods. While the government's disclosures indicate that Magyarics' opinions are based on his "self study" and work at the Anti-Defamation League, there remains a lack of explanation for how there is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The dividing line between lay opinion testimony under Rule 701 and expert opinion testimony under Rule 702 is marked by whether the opinion is based on the witness's specialized knowledge; whether the witness came by the knowledge through training, education, or the other ways that a witness can qualify to give expert testimony.

---

[3] The parties have discussed how to best provide the documents for court review in ruling on this motion and will make a submission once the Government responds to the motion.

Pursuant to Rule 701, lay opinion testimony is admissible if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) not based on scientific, technical, or otherwise specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. *United States v. Flores-de-Jesús*, 569 F.3d 8, 20 (1st Cir. 2009). Rule 702 provides that an expert may testify concerning "scientific, technical, or other specialized knowledge" if doing so "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 requires the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* applies to technical and other specialized expert testimony as well as to scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) District courts have a continuing duty to act as vigilant gatekeepers to ensure expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Kumho* at 141. In making a reliability determination, the Supreme Court has identified a variety of factors for consideration including "whether [the methodology] can be (and has been) tested," "whether the theory or technique has been subject to peer review and publication," whether there is a known rate of error, and whether the methodology is generally accepted by the scientific community. *Daubert* at 593-94, 113 S.Ct. 2786. The ultimate goal of any *Daubert* inquiry "is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field." *Kumho* at 152, 119 S.Ct. 1167. An expert's testimony needs to meet this threshold of reliability before being presented to the jury and "tested by the adversary process – [by] competing expert testimony and active cross-examination." *United States v. Vargas*, 471 F.3d 255, 265 (1st Cir. 2006).

Mr. Magyarics has an undergraduate degree in history and a masters in secondary education. He has worked at the Anti-Defamation League as an Investigative Researcher since 2005 and as a Senior Investigative Researcher since 2017. He works with law enforcement and with anti-hate groups around the country. From his submitted CV, it appears he has extensive experience studying domestic white supremacist and hate groups. However there is no evidence of Diggins' membership or involvement with any white supremacist group. Nor is there any evidence of Diggins' participation in any white supremacists or racist organizations or activities before the events at issue in this case. Rather, Mr. Magyarics is being offered to provide his thoughts on various tattoos on Diggins. Yet there is nothing connecting Diggins' to any of the groups Mr. Magyarics studies. Mr. Magyarics is expected to say that the tattoos at issue are seen on people who are racist; but there is no reliable basis to say the existence of these tattoos means someone is a racist. Nor is there any assessment of the reliability of Mr. Magyarics' opinions, they are anecdotal. He has no evidence of Diggins' thoughts at the time of getting the tattoos, he has no history or background of Diggins getting the tattoos, he does not know for how long Diggins had the tattoos, he does

not know anything about Diggins' beliefs in April 2018. There is no way of measuring reliability, accuracy, or reproducibility. Allowing Mr. Magyarics to testify as an expert about Diggins' tattoos as proof of Diggins' racist motivation or proclivities undermines the purpose of an expert witness and allows instead for a person who works for an anti-hate agency to provide what are essentially philosophical opinions. We ask that Mr. Magyarics be precluded from testifying, or the court withhold ruling until the government has attempted to lay an adequate foundation in this case including a defense voir dire opportunity.

## VII. Conclusion

The court should preclude the introduction of the compelled photographs of Diggins' tattoos and exclude any expert testimony about Mr. Magyarics' opinions as to the meaning or representations of the tattoos.

DATED: February 24, 2020

/s/ *David Beneman*
David Beneman, Esq.
Attorney for Maurice Diggins

Federal Defender
P.O. Box 595
Portland, ME 04112-0595
207-553-7070 ext. 101
David_Beneman@fd.org

## CERTIFICATE OF SERVICE

    I, **David Beneman**, attorney for **Maurice Diggins**, hereby certify that I have served, electronically, a copy of the within "**MOTION IN LIMINE TO EXCLUDE or LIMIT TATTOO EVIDENCE INCLUDING TESTIMONY OR PROPOSED GOVERNMENT EXPERT CHRISTOPHER MAGYARICS AND INCORPORATED MEMORANDUM**" upon **Sheila Sawyer**, AUSA, **Timothy Visser**, AUSA, **Amy Fairfield**, Esq. and all other counsel of record via the ECF system.

                                                                 /s/ David Beneman
                                                                 David Beneman

DATE: February 24, 2020